UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___3/16/2018___

Carmen Polanco,

                              Plaintiff,

         -against-

Commissioner of Social Security,

                              Defendant.

1:16-cv-08575 (SDA)

**OPINION AND ORDER**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

Plaintiff Carmen Polanco ("Plaintiff" or "Polanco") brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income and Disability Insurance Benefits.[1] (Compl., ECF No. 2.) Presently before the Court is the Commissioner's motion, pursuant to Fed. R. Civ. P. 12(c), for judgment on the pleadings (Def.'s Notice of Mot., ECF No. 14) and accompanying Memorandum of Law (ECF No. 15). Plaintiff has not responded to the Commissioner's motion, and the time to do so has passed. (*See* Order, dated July 14, 2017, ECF No. 17.)

For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is DENIED and the matter is remanded for further proceedings.

---

[1] On January 18, 2017, the Social Security Administration ("SSA") promulgated a final rule that dramatically changes the nature of the evaluation of medical opinion evidence. Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence, 60 Fed. Reg. 5844 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 & 416). These new regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because Polanco's claims were filed before this date, to the extent that the Social Security regulations are cited in this Report and Recommendation, the Court is referring to the version of the regulations effective before March 27, 2017.

## BACKGROUND

### I.      Procedural Background

Polanco filed her applications for benefits on April 30, 2014 alleging a disability onset date of July 1, 2009. (Administrative R. ("R.") 113-15, 116-24, ECF No. 11.) Her applications were initially denied and Polanco requested a hearing, which was held on November 12, 2015 before Administrative Law Judge ("ALJ") Michael Friedman. (R. 29-46.) ALJ Friedman denied Polanco's benefits applications on December 9, 2015. (R. 11-18.) At the hearing, Polanco was represented by a non-attorney representative. (R. 11.) ALJ Friedman's decision became the Commissioner's final decision when the Appeals Council denied review on September 23, 2016. (R. 1-5.) This action followed.

### II.      Non-Medical Evidence And Polanco's Testimony

Born on December 23, 1959, Polanco was forty-nine years old at the alleged onset of her disability and fifty-five years old at the time of the 2015 hearing. (R. 116.) Polanco completed the seventh grade in school and can speak, read and understand English (R. 137-39.) From at least 1994 until July 1, 2009, Polanco worked as an embroiderer in a clothing factory. (R. 139.)

During the administrative hearing, Polanco testified that she stopped working as an embroiderer in 2009 because of knee pain, incontinence and depression. (R. 37.) She further testified that she sees a therapist once a week and a psychiatrist, who prescribes her medicine, once per month. (R. 38.) Polanco agreed that medicine sometimes helped her mental condition, but stated that it is hard for her to concentrate and focus. (*Id.*) Polanco testified that she lives in an apartment with her daughter and does not cook, but sometimes will help clean the apartment.

(R. 34, 39.) At other times, she does not feel like doing anything and will stay in her room sleeping. (R. 40.) Polanco also testified that she does not have an active social life. (R. 43.)

In terms of her physical condition, Polanco testified that she can stand for ten to fifteen minutes before needing to sit down, and can sit comfortably for half an hour. (R. 38-39.) She testified that she could not lift a grocery bag weighing five to ten pounds, but could lift approximately one pound and could use public transportation. (R. 39.) She also testified that she had problems with frequent urination, which was worsened by lifting, carrying and walking long distances, but that she wore adult diapers to address the problem. (R. 41-42.)

A vocational expert, Miriam Green, also testified at the hearing. (R. 35-36.) Ms. Green testified that Polanco's past work fell under the specific title of "embroidery machine operator" and explained that there are two different Dictionary of Occupational Titles[2] codes for that job depending on the specific tasks performed. (*Id.*) The ALJ asked Polanco what she did generally at her job and Polanco said that she "made the symbol embroidery." (R. 36.) The ALJ asked if she "generally just [did] the same thing over and over again," to which Polanco answered "yes." (*Id.*) Based on that description of Polanco's work, Ms. Green determined that Polanco's past relevant work was in the light exertional category and had a Specific Vocational Preparation[3] ("SVP") of two. (*Id.*) Ms. Green also testified that one unscheduled work absence per month would be the

---

[2] The Dictionary of Occupational Titles "gives a job type a specific code and establishes, among other things, the minimum skill level and physical exertion capacity required to perform that job." *Brault v. Social Sec. Admin. Comm'r*, 683 F.3d 443, 446 (2d Cir. 2012) (citing SSR 00–4p, 2000 WL 1898704 (Dec. 4, 2000)).

[3] Specific Vocational Preparation is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *O'Dell v. Colvin*, No. 16-CV-368 (AJP), 2016 WL 6882861, at *10 (S.D.N.Y. Nov. 22, 2016) (citing U.S. Dep't of Labor, Dictionary of Occupational Titles Appendix C (4th ed. 1991)).

maximum permitted for competitive employment and that an employer for competitive employment would permit an employee to be off-task up to ten percent during an average workday. (R. 45.)

### III. Medical Evidence Before The ALJ

#### A. Medical History Prior To Alleged Onset Date

As of January 2007, Polanco reported problems with feeling an urgency to urinate, though her treating physician at Bellevue Hospital Center ("Bellevue"), Dr. Esther Butler, indicated that the condition had been stable over the previous few months. (R. 202.) In February 2009, Dr. Butler assessed Polanco with, among other things, stress incontinence and moderate depression. (R. 335-36.) In March 2009, Dr. Butler referred Polanco for a urology evaluation due to persistent microscopic hematuria.[4] In June 2009, Polanco complained of increasing depression. (R. 215.) She reported quitting her job because she did not feel good there, had increased stress and back pain, and her new manager yelled a lot.[5] (*Id.*). At that time, she was noted as having a PHQ-9[6] score of 22, which suggested severe depression, and was started on Lexapro. (R. 216.) Dr. Butler also noted that follow-up care had been scheduled to address Polanco's stress incontinence. (R. 217.)

---

[4] "Microscopic hematuria" is defined as "blood in the urine, the presence of which can be demonstrated only by the microscope." *Dorland's Illustrated Medical Dictionary* 743 (28th ed. 1994).

[5] Other notes in the record suggest that Polanco was laid off from her job in 2009. (*See*, *e.g.*, R. 229, 375).

[6] PHQ–9 refers to a self-administered patient health questionnaire that is used to assess and monitor the severity of a patient's depression and/or anxiety. *See Evans v. Comm'r of Social Sec.*, 110 F.Supp.3d 518, 537 n. 10 (S.D.N.Y. 2015) (citations omitted).

### B. Bellevue Hospital Center

In August 2009, Polanco underwent a flexible cystoscopy to examine her bladder. (R. 212-13.) She continued to report feeling urgency to urinate and was prescribed Vesicare. (R. 213.) During a follow-up urology visit in November 2009, Polanco reported improvement in urgency on Vesicare and a workup for microscopic hematuria was negative. (R. 326.)

In December 2009, Polanco visited the medicine clinic at Bellevue for a routine follow-up appointment with Dr. Butler. (R. 209-10.) Polanco reported that she felt well and that Lexapro was helpful for her depression, but she was still interested in counseling. (R. 209.) Dr. Butler recommended continuing Lexapro and referred Polanco to the "depression team." (R. 210.) Dr. Butler also noted that Polanco's PHQ-9 score had dropped from 22 to 8 and that her stress incontinence had improved with Vesicare. (R. 210-14.)

During her next visit with Dr. Butler in April 2010, Polanco told Dr. Butler that she had not followed up with the depression team, but that she was feeling well with Lexapro and going to the gym and going out more. (R. 206.) Based on a PHQ-9 score of 8, Dr. Butler diagnosed mild depression and decided to continue medications. (R. 207.) Polanco saw Dr. Butler again on September 16, 2010 and reported mild depression. (R. 204-06.) Dr. Butler's notes indicate that Polanco had stopped taking Lexapro for depression and did not want to restart the medication. (R. 205.) Her physical examination was normal. (R. 204.)

On April 6, 2011, Polanco was seen by Dr. Arthur Robin Williams at Bellevue. (R. 224-25.) She reported right knee pain when climbing stairs or walking more than three blocks, and that she could not bear weight on her right leg. (R. 224.) On examination, Polanco displayed full strength and range of motion in the lower extremities and had no tenderness to palpation in

either knee, though she walked cautiously with an abnormal gait. (R. 224.) Dr. Williams assessed general knee pain and advised ice, rest and Ibuprofen. (R. 224.)

At a follow up visit with Dr. Butler on May 19, 2011, Polanco reported that her knee pain had improved with Motrin, though she still experienced pain when using stairs. (R. 221.) Dr. Butler noted that Polanco's depressive disorder was improved with no medication. (R. 222.) An August 2011 rehabilitation note from Dr. Rudy Malayil at Bellevue noted that Polanco had right knee weakness after walking up more than two flights of stairs or on prolonged ambulation. (R. 218.) On examination, she had no obvious deformity, atrophy or swelling. (R. 218.) She displayed full strength, normal reflexes, full squatting and normal gait. (R. 218.) A knee X-ray suggested early osteoarthritis. (R. 249.) As of September 2011, Dr. Butler noted that her knee pain was relieved with Tylenol. (R. 234-36.)

In February 2012, Polanco returned to the Bellevue medicine clinic for a routine visit, where she reported continued bilateral knee pain and requested to see a physical therapist and a podiatrist for orthotics. (R. 232-33.) Dr. Muhibur Rahman provided the referrals requested. (R. 233.)

On September 5, 2012, Polanco had a follow-up appointment with Dr. Butler where she reported that she was still depressed, with symptoms that waxed and waned, but that she had no suicidal ideations. (R. 229.) Dr. Butler noted that Polanco still was not working after being laid off over three years ago, and this contributed to her depression. (R. 229.) Polanco said she otherwise felt well. (R. 229.) On examination, Polanco had a PHQ-9 score of 11, suggesting moderate depression. (R. 230.) She agreed to start Lexapro again and was referred to the depression team. (R. 230.)

On March 6, 2013, Polanco had a psychiatry visit with Dr. Christina Sekaer at Bellevue, where she was tearful through much of the session. (R. 237-38.) A mental status examination showed that Polanco was fully oriented and had a normal thought process, but suffered from mild to moderate depression. (R. 238.) Polanco complained of difficulty sleeping and an ongoing depressed mood in spite of taking Lexapro for several weeks. (*Id.*) Dr. Sekaer prescribed Trazodone, and suggested Polanco start psychotherapy with the depression team. (R. 238.)

On August 22, 2013, Polanco visited Dr. Butler, reporting that she had stopped taking Lexapro and was taking only Trazodone for her depressive disorder, but that she did not want to increase the dosage as she felt it was working okay. (R. 227.) For her knee pain, Dr. Butler suggested that she continue Tylenol as needed and ice her knee two to three times a day. (R. 227.) Polanco had a September 2013 radiograph of both knees, which showed osteoarthritis in the right knee. (R. 533.)

At a follow-up visit on October 21, 2013, Polanco told Dr. Butler that her knee pain had improved somewhat with physical therapy at an outside facility. (R. 242.) She reported that her depression was a little worse and that she was taking Trazodone only intermittently. (R. 242.) She had a PHQ-9 score of 13, indicating moderate depression, and was encouraged to restart Trazodone nightly. (R. 243.) On March 27, 2014, Polanco returned to Dr. Butler and reported that she began taking a higher dose of Trazodone, which seemed to help her with sleep and depression. (R. 239.) She had a PHQ-9 score of 7, indicative of mild depression. (R. 240.)

On September 4, 2014, Polanco reported to Dr. Butler that her knee pain had returned, noting increased pain with stairs, and said she wanted to try physical therapy again. (R. 358.) Polanco felt her mood was a little better and did not want to see a psychiatrist. (R. 358.)

In January 2015, Polanco returned to Bellevue, reporting a chronic low level of depression that was unchanged for many years and indicating that she was interested in a psychiatric follow-up. (R. 355.) On physical examination, Polanco was directed to take Tylenol as needed for her knee pain and was referred for psychiatric treatment. (R. 356.) During a follow-up visit in April 2015, Dr. Butler noted that Polanco was pursuing psychiatric therapy and that her sleep had improved with Trazodone. (R. 352.)

On January 16, 2015, Polanco attended a psychiatric walk-in appointment at Bellevue with Dr. Sheen Chenthitta. (R. 371-73.) On mental examination, Polanco was cooperative and displayed a normal mood, but had a constricted affect. (R. 372.) Dr. Chenthitta noted that Polanco's insight and judgment were not grossly impaired. (R. 372.) Dr. Chenthitta diagnosed depressive disorder, assigned a global assessment of functioning ("GAF")[7] score of 55.3, and referred Polanco to the outpatient psychiatry clinic. (R. 372.)

On March 9, 2015, Polanco visited the outpatient psychiatric clinic and was seen by Dr. Judy Greene. (R. 374-90.) Polanco said she wanted to be alone and not around people. (R. 374.) She reported her primary stressors as conflict between her daughters, loss of her job and sleep difficulties. (R. 375.) She said that she had not had active suicidal thoughts in the past month. (R. 381.) On mental status examination, Polanco had distant relatedness, blunted affect and depressed mood. (R. 382-83.) Dr. Greene diagnosed Polanco with depressive disorder and

---

[7] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.' A GAF between 51 and 60 indicates '[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).'" *Kohler v. Astrue*, 546 F.3d 260, 262 n. 1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders 32, 34 (4th ed. 2000)).

assigned a GAF score of 56. (R. 383.) Polanco declined medication and said she was seeking only individual therapy. (*Id.*) Polanco reported feeling comfortable conversing in English and understanding English very well, but Dr. Greene wrote that Polanco's expressive English language skills appeared limited and the physician had trouble understanding her at times due to Polanco's accent. (R. 385-86.) Therefore, Dr. Greene recommended Spanish-speaking treatment. (R. 387.)

In April 2015, Polanco started her psychotherapy sessions with Irene Rosenthal, a Licensed Clinical Social Worker ("LCSW"). (R. 392-94, 399-415, 418-25.) During her first session on April 6, Polanco presented with a depressed mood as well as passive suicidal ideation. (R. 393.) Polanco confirmed low mood, frequent crying spells, anhedonia[8], low energy, social isolation and occasional anxiety. (R. 392.) Polanco reported that this episode began after she left her factory job due to a supervisor's harsh treatment. (*Id.*) She indicated a passive wish to die, but denied any active social ideation. (*Id.*)

Polanco saw LCSW Rosenthal again on April 27, 2015 for her second therapy session. (R. 399-404.) Polanco's mood and suicidal ideation remained the same. (R. 399-400.) She further discussed her work and social history and reported a "lifelong difficulty" with trusting others given that she saw others gossip at her job. (R. 399.) Polanco reported wanting to return to work as long as "no one yells at" her. (*Id.*)

During a session at the walk-in clinic on May 12, 2015, Polanco reported that she cried all the time and did not leave the house. (R. 395.) A mental status examination included an "okay" mood and full affect. (R. 395.) Polanco had a PHQ-9 score of 19, suggestive of moderately severe

---

[8] "Anhedonia" is defined as "total loss of feeling of pleasure in acts that normally give pleasure." *Dorland's Illustrated Medical Dictionary* 83 (28th ed. 1994).

depression. (R. 396.) The provider noted that Polanco "continues to be at risk given social isolation and passive [suicidal ideation] and severe anhedonia." (R. 395.)

In June 2015, Polanco reported no suicidal ideations, but continued to have a depressed mood. (R. 422.) LCSW Rosenthal noted that Polanco "was depressed but without acute risk." (R. 423.) Polanco's condition was similar during sessions held in July 2015. (R. 405-15, 418-25.) At an appointment with Dr. Greene on July 16, 2015, Polanco said that she was still depressed, and that she was taking Prozac daily, but had not noticed any improvement in mood. (R. 427.) Polanco presented as tearful and depressed. (R. 428.) Dr. Greene advised tapering off Prozac and starting Cymbalta. (R. 429.)

### C.  Dr. Ted Woods – Physical Consultative Examination

Dr. Ted Woods performed a physical consultative examination for Polanco in June 2014. (R. 258-61.) Dr. Woods noted that Polanco walked with a normal gait, but had some difficulty walking on her heels and toes and had pain in her left knee. (R. 259.) Polanco used no assistive device and had a normal stance. (R. 259.) Her squat was full but she held on to the exam table. (R. 259.) She had a full range of motion in her spine and in all joints and displayed full strength in all extremities. (R. 260.) Dr. Woods noted that an X-ray of Polanco's left knee showed no significant abnormality. (R. 260.) Dr. Woods diagnosed Polanco with left knee pain, hypertension and depression, all by history. (R. 261.) He opined that Polanco had no limitations in sitting, standing, pushing, pulling, climbing or carrying objects. (R. 261.)

### D.  Dr. T. Inman-Dundon – State Agency Opinion

Dr. T. Inman-Dundon reviewed the evidence of record in July 2014 and submitted a Disability Determination Explanation report. (R. 50-51.) He wrote that Polanco had mild

limitations in activities of daily living, social functioning, and concentration, persistence, or pace. (R. 50.) He thought that she had no repeated episodes of decompensation. (R. 50.) Dr. Inman-Dundon opined that Polanco's psychiatric impairments were no more than mild. (R. 51.)

### E. Dr. Haruyo Fujiwaki – Psychiatric Consultative Examinations

Dr. Haruyo Fujiwaki completed two psychiatric consultative examinations for Polanco, one in June 2014 and a second in July 2015. (R. 253-56, 269-72.) In June 2014, Dr. Fujiwaki noted that Polanco presented with a mildly dysphoric affect[9], dysthymic mood[10] and clear sensorium[11], and had an adequate manner of relating and social skills. (R. 254.) Her attention and concentration were intact; she was able to count and do simple calculations. (*Id.*) Dr. Fujiwaki found that Polanco displayed mildly impaired recent and remote memory skills. (*Id.*) He further noted that Polanco displayed fair insight and judgment, but her cognitive functioning appeared to be below average. (R. 255.) Dr. Fujiwaki diagnosed unspecified depressive disorder and unspecified anxiety disorder and opined that Polanco could follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration and maintain a regular schedule. (*Id.*) He believed that she was moderately impaired in performing complex tasks, relating adequately with others and appropriately dealing with stress. (*Id.*)

During the second psychiatric consultative examination in July 2015, Polanco reported difficulty falling asleep, loss of appetite and sometimes having thoughts of suicide without any

---

[9] Dysphoric affect refers to an impairment of voice or difficulty speaking. *See Dorland's Illustrated Medical Dictionary* 517 (28th ed. 1994) (defining "dysphoric" and "dysphoria").

[10] "Dysthymic" is defined as "depressed." *Dorland's Illustrated Medical Dictionary* 517 (28th ed. 1994).

[11] "Sensorium" is defined, inter alia, as "the condition of a subject relative to the subject's consciousness or mental clarity." *Dorland's Illustrated Medical Dictionary* 1507 (28th ed. 1994).

plan or intent. (R. 270.) She also reported loss of energy, loss of interest and crying spells. (*Id.*) Polanco complained of anxiety with palpitation and breathing difficulty, and at times seeing shadows in a room. (*Id.*) She indicated that she could perform self-care, but did not take public transit alone, did not have friends, and had poor family relationships. (R. 271.)

On examination, Dr. Fujiwaki noted that Polanco was cooperative but evasive with an adequate manner of relating. (R. 270.) He found that she presented with coherent and goal-directed thought processes, anxious affect, dysthymic mood and clear sensorium. (*Id.*) Dr. Fujiwaki also noted that Polanco appeared to have impaired attention, concentration, and recent and remote memory skills, and her cognitive functioning appeared to be below average. (R. 271.)

Dr. Fukjwaki opined that Polanco could follow and understand simple directions; perform simple tasks independently; maintain a regular schedule; make appropriate decisions; and learn simple tasks. (R. 271, 282.) However, he found that she was mildly impaired in relating adequately with others and was moderately limited in maintaining attention and concentration, performing complex tasks and dealing with stress. (R. 271.) In a medical source statement, Dr. Fujiwaki elaborated that Polanco had mild limitations in understanding and remembering complex instructions, and moderate limitations in making judgments on complex work-related decisions. (R. 282.) He believed that she had no issues interacting appropriately with the public, but had mild problems interacting with supervisors and co-workers, and moderate issues with responding appropriately to usual work situations and to changes in a routine work setting. (R. 283.)

**F.  Dr. Aurelio Salon – Internal Consultative Examination**

Dr. Aurelio Salon performed an internal consultative examination on Polanco in July 2015. (R. 264-67.) Polanco reported pain in both knees. (R. 264.) Dr. Salon found that Polanco was

mildly obese, but walked with a normal gait and appeared to be in no acute stress. (R. 265.) She declined to walk on her heels and toes and squatted one-third of full. (*Id.*) She used no assistive device, needed no help changing for the examination or getting on or off the examination table, and could rise from her chair without difficulty. (*Id.*) She displayed full range of motion in her spine, shoulder, elbows, forearms, wrists, hips, knees and ankles. (R. 266.) She had no sensory deficit and full strength in all extremities. (*Id.*)

Dr. Salon diagnosed a history of depression, history of hypertension, history of knee pain, history of hypercholesterolemia and mild obesity. (R. 267.) He opined that Polanco had no restrictions in sitting, standing, climbing, pushing, pulling or carrying heavy objects. (*Id.*) Dr. Salon completed a medical source statement that Polanco could occasionally lift and carry up to 50 pounds; frequently lift and carry up to 20 pounds; sit eight hours without interruption in a workday; and stand and walk for two hours at one time, up to six hours in a workday. (R. 287.) He believed that Polanco could frequently stoop and climb stairs and ramps, and that she could occasionally balance, kneel, crouch, crawl and climb ladders or scaffolds. (R. 289.)

IV.    **Additional Evidence Submitted To The Appeals Council**

Polanco submitted additional medical evidence to the Appeals Council including medical records from Naturo-Medical Health Care ("Naturo-Medical") covering the period from December 21, 2015 through March 2016 (R. 547-52, 558-61), as well as a medical source

statement from her psychiatrist at Bellevue, Dr. Judy Greene, dated February 9, 2016. (R. 553-57.)

    **A.  <u>Naturo-Medical Health Care</u>**

Dr. Zhaoming Huang of Naturo-Medical examined Polanco on December 21, 2015, and referred her for physical therapy. (R. 547.) His note indicated tenderness and decreased range of motion in the lumbar spine. (R. 547.) Dr. Huang also reported that Polanco had crepitus[12] in both knees and complained of pain on motion in her knees. (R. 547.) Upon examination, Polanco's range of motion in her right knee was limited. (R. 547.) Polanco returned to Naturo-Medical on January 26, 2016 and was examined by Dr. Lijun Song. (R. 550, 552.) Polanco reported improvement in her lower back pain and knee pain after attending seven sessions of physical therapy and taking Motrin as needed. (R. 550.)

Dr. Ysai Chung Chao from Naturo-Medical completed a physical medical source statement on March 16, 2016. (R. 558-61.) He reported seeing Polanco once per month since December 21, 2015. (R. 558.) In the report, Dr. Chao wrote that he believed Polanco could walk three to four blocks without needing to rest or having severe pain; could sit for one hour each time before needing to get up and could stand for fifteen minutes at one time; and that Polanco would need to lie down as part of an unscheduled break almost every day. (R. 559.) Dr. Chao indicated that Polanco could stand/walk for less than two hours in a workday, but also indicated in the same section of the form, that she could stand/walk for at least six hours in a workday. (*Id.*) Dr. Chao opined that Polanco could rarely lift and carry less than ten pounds, rarely twist, stoop and climb

---

[12] "Crepitus" or "crepitation" is defined as "a noise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions." *Stedman's Medical Dictionary* 457 (28th ed. 2005).

stairs, and never crouch, climb ladders or lift and carry more than ten pounds. (R. 560.) He wrote that she could perform reaching ten percent of the day and fine manipulation twenty percent of the day. (R. 560.) Dr. Chao believed that Polanco would be absent from work more than four days per month. (R. 561.) Dr. Chao noted that emotional factors contributed to the severity of Polanco's symptoms and functional limitations. (*Id.*)

### B. Report From Dr. Judy Greene

Dr. Judy Greene completed a mental medical source statement on February 9, 2016. (R. 553-57.) She wrote that Polanco had been in mental health treatment at Bellevue since March 2013. (R. 553.) Dr. Greene indicated a diagnosis of recurrent, severe major depression, and included her findings that Polanco had low energy, depressed mood and chronic pain. (*Id.*) She also indicated that Polanco's psychiatric condition exacerbated her back and knee pain. (R. 554.) Dr. Greene stated that Polanco had marked restrictions in daily living, social functioning, and concentration, persistence, or pace. (*Id.*) She also indicated that Polanco had four or more repeated episodes of decompensation within a twelve-month period. (*Id.*) Dr. Greene checked boxes that Polanco was unable to meet competitive standards in maintaining attention for two-hour segments, maintaining attendance, completing a workday or workweek without interruptions from psychological symptoms and dealing with normal work stress. (R. 555.) She also checked that Polanco was seriously limited, but not precluded, in remembering work-like procedures, understanding and remembering very short and simple instructions and sustaining an ordinary routine without special supervision. (*Id.*) She thought Polanco would miss more than four days of work per month. (R. 556.)

**DISCUSSION**

I.   **Legal Standards**

     A.  **Standard Of Review**

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-4518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir.1999); *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.1987)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id*; *accord Johnson*, 817 F.2d at 986.

Absent legal error, an ALJ's determination may be set aside if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *See Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995). The Court, however,

will not defer to the Commissioner's determination if it is the product of legal error. *See Douglass v. Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012).

Where, as here, the Court is presented with an unopposed motion, it may not find for the moving party without reviewing the record and determining whether there is a sufficient basis for granting the motion. *See Wellington v. Astrue*, No. 12-CV-3523 (KBF), 2013 WL 1944472, at *2 (S.D.N.Y. May 9, 2013) (recognizing, in an action appealing the denial of disability benefits, the court's obligation to review the record before granting an unopposed motion for judgment on the pleadings); *Martell v. Astrue*, 09-CV-1701 (NRB), 2010 WL 4159383, at n.4 (S.D.N.Y. Oct. 20, 2010) (same); *cf. Vt. Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004) ("[C]ourts, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.") (internal quotation marks and citation omitted).

Further, *pro se* litigants "are entitled to a liberal construction of their pleadings," and, therefore, their complaints "should be read to raise the strongest arguments that they suggest." *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) (internal quotation marks and citation omitted); *see also Alvarez v. Barnhart*, No. 03-CV-8471 (RWS), 2005 WL 78591, at *1 (S.D.N.Y. Jan. 12, 2005) (articulating liberal standard in reviewing denial of disability benefits for *pro se* plaintiff).

### B.  Determination Of Disability

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A).

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in [§ 404.1509/§ 416.909] [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

18

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920.

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given her residual functional capacity, age, education and past relevant work experience. *Id*. at 51.

## II.    ALJ Friedman's Decision And Appeals Council Review

Following the five-step process, ALJ Friedman determined that Polanco did not have a disability within the meaning of the Act. The ALJ found at step one that Polanco had not engaged in substantial gainful activity since July 1, 2009, the alleged onset date.  (R. 13.)  At step two, the ALJ found that Polanco had severe impairments of right knee osteoarthritis and depressive disorder, but that her overactive (hypertonic) bladder was not severe. (*Id.*) At step three, the ALJ found that Polanco did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 14.) The ALJ then assessed Polanco's residual functional capacity ("RFC"), and determined that she had the RFC to perform medium work, except that she was limited to jobs

involving simple, routine, repetitive type tasks, requiring only occasional contact with supervisors, coworkers and the public. (R. 15.)

At step four, ALJ Friedman found that Polanco could perform past relevant work as an embroidery machine operator. (R. 18.) Thus, the ALJ found that Polanco was not disabled and denied her claim for benefits. (*Id.*) The ALJ did not proceed to step five. Following the ALJ's decision, Polanco sought review from the Appeals Council, which denied her request on September 23, 2016. (R. 1-5.)

## III.    Analysis

### A.    The ALJ Erred In Determining That Polanco Was Capable Of Performing Past Relevant Work As An Embroidery Machine Operator

The ALJ determined that Polanco had the RFC to perform medium work as defined in 20 CFR §404.1567(c) and §416.967(c), except that she is limited to jobs involving simple, routine, repetitive type tasks, requiring only occasional contact with supervisors, coworkers and the general public.[13] (R. 15.) The ALJ then concluded, "[i]n comparing the claimant's residual functional capacity with the physical and mental demands of [her past relevant work as an embroidery machine operator,]" that Polanco could perform that work as it is actually and generally performed. (R. 18.) However, the ALJ did not make any findings regarding the mental demands of working as an embroidery machine operator and, in particular, did not consider whether such work was compatible with his own determination that Polanco was limited to jobs

---

[13] The Court does not determine whether the ALJ's RFC determination is supported by substantial evidence because, even assuming it is, the Court finds legal error necessitating remand.  On remand, the ALJ will be required to make a new RFC determination taking into account additional evidence in the record.  *See infra*, section III(B).

with only occasional contact with supervisors and coworkers. Thus, the record lacks sufficient evidence to determine whether or not Polanco could perform her past relevant work.

While the Court recognizes that it is claimant's burden to show, at step four, that she cannot perform her past relevant work, an ALJ must make "a specific and substantial inquiry into the relevant physical and mental demands associated with the claimant's past work, and compare these demands with the claimant's residual capacities." *Goldman v. Colvin*, No. 13-CV-03291 (KMK), 2016 WL 3522281, at *1 (S.D.N.Y. June 22, 2016) (citing cases). This comports with the ALJ's general duty to develop the record in light of the non-adversarial nature of social security proceedings. *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (ALJ's duty to develop the record remains even where the claimant is represented by counsel). Further, when a plaintiff's impairment is a mental one, courts have recognized that "special care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety . . . in order to determine if the claimant's mental impairment is compatible with the performance of such work." *Welch v. Chater*, 923 F. Supp. 17, 20-21 (W.D.N.Y. 1996); *see also Craven v. Apfel*, 58 F. Supp. 2d 172, 187 (S.D.N.Y. 1999) (citing *Welch*).

Here, the ALJ stated that "[t]he vocational expert testified that claimant could return to her past relevant work" (R. 18), but that conclusion overstates the vocational expert's testimony. The vocational expert testified that Polanco's past work was at the light exertional level and had an SVP of 2. (R. 35-36.) However, she did not testify as to the *mental* demands of the work or how often someone working as an embroidery machine operator would have to interact with coworkers or supervisors. Nor did the ALJ ask Polanco any questions regarding these factors.

The ALJ's failure to adequately develop the record regarding the mental demands of Polanco's previous work, including the amount of time she was required to interact with coworkers and supervisors, makes his step-four determination the result of legal error. *See Abbott v. Colvin*, 596 Fed. App'x 21, 23 (2d Cir. 2015) (summary order) (remanding because ALJ's analysis failed to consider claimant's nonexertional limitations and was therefore inadequate to determine whether she could perform past relevant work); *Goldman*, 2016 WL 3522281, at *1 (requirements of plaintiff's past work were not sufficiently developed by the ALJ). Without such evidence, neither the ALJ nor this Court can assume that Polanco's previous work was compatible with the ALJ's RFC determination. This is particularly true because there is evidence in the record suggesting that Polanco had experienced problems with harsh treatment by a supervisor in the past. (*See*, *e.g.*, R. 392.)

An error at step four cannot be considered harmless where, as here, the ALJ did not proceed to the step five analysis, where the Commissioner has the burden of proof. *See Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 1999) ("A remand for further proceedings is the appropriate remedy when an erroneous step four determination has precluded any analysis under step five.") Notably, the Court may not consider whether the ALJ's RFC analysis would otherwise warrant a finding that Polanco is not disabled under the Medical Vocational Rules, no matter how likely that outcome, because the Court may not affirm an administrative action on grounds different from those considered by the agency. *See Hunter v. Colvin*, No. 13-CV-650S, 2014 WL 4923103, at *4 (W.D.N.Y. Sept. 30, 2014) (citing *Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir.2008)) (additional quotations and citations omitted). The ALJ's decision simply is devoid of any analysis of the mental demands of Polanco's past work. Thus, remand is required. On remand, the ALJ

should consider whether Polanco can perform her past relevant work as an embroidery machine operator based on her mental impairments and RFC and, if not, whether or not she is capable of performing any other work in the national economy.

**B. Polanco's Submissions To The Appeals Council Should Be Considered Upon Remand**

Following denial of her benefits applications, Polanco submitted new evidence to the Appeals Council, including additional medical records regarding her physical impairments (R. 547-52, 558-61) and a medical source statement from her treating psychiatrist, Dr. Greene. (R. 553-57.)

Under the applicable regulations:

> if new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. . . . It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. §§ 404.970(b), 416.1470(b). Material evidence is evidence that is "both relevant to the claimant's condition during the time period for which benefits were denied and probative." *Tirado v. Bowen*, 843 F.2d 595, 597 (2d Cir. 1988). The Appeals Council found that the new evidence was outside of the relevant time period because it postdated the ALJ's decision. (R. 2.)

The Court finds that the medical records from Naturo-Medical were outside the relevant time period. However, the medical source statement from Dr. Greene may relate to Polanco's condition prior to the date of the ALJ's decision or, at the very least, may have shed light on the severity of her condition during the relevant time period. *See Williams v. Comm'r Soc. Sec.*, 236 Fed. App'x 641, 644 (2d Cir. 2007) ("medical evidence generated after an ALJ's decision [can] not

be deemed irrelevant solely because of timing, [as] subsequent evidence of the severity of a condition suggests that the condition may have been more severe in the past than previously thought."). The Court need not now decide whether this new evidence would render the ALJ's decision contrary to the weight of the evidence because this case will be remanded for further development of the record in any event. On remand, the ALJ should assess this new evidence in order to review Polanco's claims on a complete record. *See Vasquez v. Colvin*, No. 14-CV-7194 (JLC), 2015 WL 4399685, at *21 (S.D.N.Y. July 20, 2015) (new evidence submitted to the Appeals Council should be considered on remand).

## CONCLUSION

For the foregoing reasons, the Court DENIES the Commissioner's motion for judgment on the pleadings and remands this matter to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

DATED:     March 16, 2018
              New York, New York

_____
**STEWART D. AARON**
**United States Magistrate Judge**